# Illinois Official Reports

## Appellate Court

---

### *Allen v. Cam Girls, LLC*, 2017 IL App (1st) 163340

---

| | |
|---|---|
| Appellate Court Caption | ROBIN ALLEN, Plaintiff-Appellant, v. CAM GIRLS, LLC, d/b/a Jazzercise Glenview, ALLIANCE INVESTMENT SOURCE, LLC, INTERFORUM HOLDINGS, INC., and ZL LANDSCAPING, INC., Defendants (Alliance Investment Source, LLC, and ZL Landscaping, Inc., Defendants-Appellees). |
| District & No. | First District, Second Division<br>Docket No. 1-16-3340 |
| Filed | December 26, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-L-007887; the Hon. John H. Ehrlich, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Randall A. Wolff & Associates, Ltd., of Arlington Heights (Randall A. Wolff and Kevin C. Buge, of counsel), for appellant.<br><br>Leahy, Eisenberg & Fraenkel, Ltd., of Chicago (David I. Walters, of counsel), for appellees. |
| Panel | JUSTICE MASON delivered the judgment of the court, with opinion.<br>Presiding Justice Neville and Justice Pucinski concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiff Robin Allen was injured when she slipped in the parking lot of a strip mall. The property owner, defendant Alliance Investment Source, LLC (Alliance), had a contract for snow removal with defendant ZL Landscaping, Inc. (ZL). Allen brought suit against Alliance and ZL, among others, alleging that their negligent maintenance of the lot caused an unnatural accumulation of snow and ice that caused her fall.

¶ 2    The trial court granted summary judgment to defendants, and we affirm. Although Allen's experts presented some evidence of an unnatural accumulation of ice in the parking lot, Allen could not establish a causal relationship between that alleged unnatural accumulation and her fall since she did not see what she fell on but only "assum[ed]" and "guess[ed]" that it was ice. Thus, she failed to raise an issue of material fact as to whether defendants' alleged negligence was the proximate cause of her injuries.

¶ 3                                    BACKGROUND

¶ 4    Around 8 a.m. on February 10, 2013, Allen was going to a Jazzercise class at 1151 Waukegan Road in Glenview, Illinois. The studio was located in a strip mall owned by Alliance. According to Allen, the parking lot was covered in matted-down snow. As she walked across the parking lot, she slipped and fell, fracturing her ankle.

¶ 5    Allen initially brought suit against Alliance and others who are not parties to this appeal. She later amended her complaint to add ZL as a defendant. In her second amended complaint, she alleged that the design of the parking lot caused melted snow to pool and freeze in areas where customers walk. She also alleged that ZL plowed the parking lot in ways that caused unnatural accumulations of snow and ice, including "black ice" in uneven, deteriorated areas of the parking lot.

¶ 6    During her deposition, Allen discussed three factors that she believed contributed to her fall. First, she "assum[ed]" that she slipped on a patch of ice.

          "COUNSEL FOR ALLIANCE: Do you know if you stepped upon a patch of ice that was underneath the snow or if the snow in and of itself was slippery?

          ALLEN: I'm just assuming that it was ice, but I don't know that for sure. I mean, the way I went down and the fact that I went down so fast made me think that there was ice under the snow.

          Q. But you can't say with any degree of certainty if it was a patch of ice that you slipped on, correct?

          A. I did not see any ice, but I did see snow.

          Q. Since you didn't see any ice, would you agree that any statement that you would have tripped on ice would be a guess on your part?

          A. It would be a guess on my part."

¶ 7    Second, there was a three-foot-high mound of snow a few yards away from where Allen fell. Allen stated that the mound "easily could have" contributed to her fall: "[T]he weather the week prior [was] warm and then cold and then warm and then cold. So I could see the mounds thawing and then refreezing when it got cold." But she did not observe trailing water, or anything else, leading from the mound to the spot where she fell. Third, the snow in the parking

lot was matted down, rather than fresh, which she believed made it more likely that someone would fall.

¶ 8    After Allen fell, she scooted on her backside back to her car, which was 20 to 30 feet away. The snow was compacted and slippery. She "assum[ed]" it was icy because she was able to maneuver across the surface. While scooting back to her car, she saw "slippery stuff" beneath the snow, which she later characterized as ice. But she reiterated that she did not see any ice at the spot where she fell. When Allen reached her car, she called for paramedics, and an ambulance came. The paramedics carried her on a stretcher to get her into the ambulance, which was difficult because they were "slipping" and "sliding."

¶ 9    Officer Anthony Nitti responded to the scene of Allen's accident at around 8:30 a.m. He observed ice throughout the parking lot, including areas of bumpy ice. Nitti had to be very careful and take small steps while crossing. He saw no unplowed snow in the lot. Although Nitti did not issue a citation to the owner of the parking lot, he believed that the slippery condition of the parking lot could be hazardous.

¶ 10    At the time of Allen's fall, Alliance had a lease agreement with Jazzercise providing that Alliance was "responsible for the removal of snow, ice and debris from the sidewalks, walkways, parking lot and other exterior areas of the Premises *** on a timely basis."

¶ 11    Under Alliance's contract with ZL for snow removal, after any snowfall of two or more inches, ZL was required to plow the parking lot and remove snow from the adjacent walkways. The contract did not state that ZL had to remove ice or salt the parking lot; it only referenced "[s]now [p]lowing" and "snow removal." Nevertheless, Alex Zdanov, Alliance's managing member, understood that ZL would salt if necessary. Likewise, Alina Sandal, whose job it was to answer phone calls related to maintenance issues on the premises, thought ZL was salting throughout the snow plowing season. But Zenon Lopez, the owner of ZL, stated that Sandal told him not to salt the parking lot, a service for which ZL would have charged extra. In any case, it is undisputed that ZL did not salt the parking lot prior to Allen's accident.

¶ 12    Lopez performed all of ZL's snow removal services. When he plowed the Jazzercise parking lot, he typically pushed the snow to the east and south edges of the lot, creating mounds of snow. He did not use a dump truck to remove snow from the site. If Lopez plowed during the day when there were cars in the lot, he could not plow those areas. If there was a lot of snow, Lopez would plow around the cars, making a "path" or "trench" in which the cars could drive. Lopez would then return at night when the parking lot was empty to finish plowing.

¶ 13    Lopez could not independently recall the condition of the parking lot on February 8 through 10. Sometime in February after Allen's fall, a representative from Alliance called Lopez to tell him that there had been an accident in the parking lot and ask him to salt. Lopez salted the parking lot later that day. Alliance agreed to pay him an additional $150 per month for salting, and they paid him the full amount for February even though he started mid-month. An invoice from ZL reflects that in January, ZL charged Alliance $250 for snow plowing, while in February, ZL charged $250 plus $150 for salting.

¶ 14    Evidence was introduced about the weather and the condition of the parking lot on the days leading up to Allen's accident on February 10. In the early morning of Friday, February 8, there was a 4.3-inch snowfall. It was warm when the precipitation began but then dropped below freezing, resulting in layers of ice. There was no further precipitation on February 9 and 10.

¶ 15    Melissa Kompera, the franchise owner of the Glenview Jazzercise, arrived at the Jazzercise studio on the morning of February 8 after the storm. The parking lot had not been plowed. She called Sandal at the Alliance management office to complain, but the lot was still not plowed by that evening.

¶ 16    On the morning of Saturday, February 9, the parking lot had been plowed, but the plowing was "all choppy" from, Kompera assumed, the plow going around parked cars. "You had to climb through the parking lot," she said. "You had to find your footing between snow and ice." Kompera made a second complaint to the Alliance management office and was told that it would be taken care of.

¶ 17    That same morning, Shannon Connelly arrived to attend a 10:30 a.m. class at the studio. The parking lot was covered by a thick layer of ice with a layer of water on top of it. Connelly could not find a place to park that would enable her to walk safely to the Jazzercise building. She eventually parked down the street and used another entrance to the building.

¶ 18    Connelly was home by noon and did not return to the Jazzercise parking lot to determine whether any work was done to clear the ice. Kompera returned to the studio late that afternoon and found that the parking lot was "clear." All the uneven ice and snow had been removed, and there was no ice or snow at all on the parking spaces.

¶ 19    On Sunday, February 10, Kompera arrived at the Jazzercise studio late in the morning, after Allen's accident. The parking lot was completely clear of snow, although Kompera could not recall if there was ice. She also could not recall if the walkways adjacent to the parking spaces were clear of snow and ice.

¶ 20    Alliance and ZL moved for summary judgment, arguing that Allen could not prove negligence since she could not identify the cause of her fall. In particular, she could not state with certainty whether she fell on ice, and she did not see any standing or accumulated water on the day she fell. ZL also argued that there was no evidence that it breached its contract with Alliance since Alliance instructed ZL not to salt the lot and there was less than two inches of snow on the ground at the time of Allen's fall.

¶ 21    In response to defendants' motion for summary judgment, Allen argued that Alliance breached its contractual duty to its tenant to salt the parking lot and remove ice, while ZL breached its contractual duty to properly plow the lot, as evidenced by Kompera's testimony about the condition of the lot on February 8 and 9. She also argued that the parking lot was plowed negligently in a way that led to unnatural accumulations of snow and ice.

¶ 22    In support of this contention, Allen attached affidavits from two retained experts, Richard Arlington and Kevin Lewis. Arlington, who had over 30 years of experience in snow and ice removal, opined that Alliance and ZL were negligent and their negligence caused Allen's fall. First, ZL was supposed to plow after two inches of snowfall, but it failed to do so on February 8. Instead, it waited until the four-inch snowfall stopped and then waited even longer, until sometime in the afternoon after Kompera's complaint. Second, when ZL finally did plow, it plowed around the cars in the parking lot, creating trails of snow and ice that thawed and refroze into the depressions in the lot where Allen fell. Third, ZL did not salt the lot. Instead, it plowed over the ice, creating additional bumps and crevices that would have thawed and refrozen in the area of Allen's fall. Thus, ZL created a hazardous condition in the parking lot. Arlington opined that if ZL had removed the snow and ice from the lot promptly and properly, there would have been no snow or ice trenches or bumps in the parking lot.

¶ 23    Kevin Lewis, a civil engineer, opined to a reasonable degree of engineering certainty that "the snowplowing and owner's maintenance of the parking lot would have created icy conditions that led to the plaintiff falling." Lewis created a site map showing the drainage flow pattern for the parking lot. He opined that, according to the flow pattern, snow mounds piled at the southeast end of the lot would have thawed and refrozen in the depression in the lot where Allen fell. Additionally, plowing around the lot in a U shape (as ZL did) would have created ridges of snow and ice, which would have also thawed and refrozen in the area of Allen's fall.

¶ 24    On July 25, 2016, before the trial court ruled on defendants' summary judgment motions, Allen moved for leave to file a third amended complaint in which she added various allegations against Alliance and ZL.

¶ 25    On August 29, 2016, the trial court entered summary judgment for defendants on the negligence counts of Allen's complaint and entered a finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) that there was no cause for delaying enforcement and appeal of the order.[1] The court denied Allen's motion for reconsideration on November 22, 2016, and also denied Allen's motion to file a third amended complaint on December 13, 2016. Allen filed a timely notice of appeal on December 20, 2016.

¶ 26                                    ANALYSIS

¶ 27    Allen argues that the trial court erred in granting summary judgment to defendants because (i) there was a material issue of fact as to whether defendants could be held liable under a voluntary-undertaking theory or (ii) alternately, there was a material issue of fact as to whether defendants' actions created an unnatural accumulation of snow and ice that contributed to Allen's fall. Allen further contends the trial court erred in denying her leave to file a third amended complaint.

¶ 28    We review the trial court's grant of summary judgment *de novo* (*Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008)), keeping in mind that summary judgment is only appropriate where "there is no genuine issue as to any material fact and *** the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2012). We must construe the record strictly against the movant and liberally in favor of the nonmoving party. *Williams*, 228 Ill. 2d at 417. In order to prevail, the nonmoving party must present some evidence that would arguably entitle her to recover at trial. *Keating v. 68th & Paxton, L.L.C.*, 401 Ill. App. 3d 456, 472 (2010).

¶ 29    Under the common law, a property owner has no general duty to remove natural accumulations of snow and ice because " 'it is unrealistic to expect property owners to keep all areas where people may walk clear from ice and snow at all times during the winter months.' " *Claimsone v. Professional Property Management, LLC*, 2011 IL App (2d) 101115, ¶¶ 18, 21 (quoting *Ordman v. Dacon Management Corp.*, 261 Ill. App. 3d 275, 281 (1994)); see also *Frederick v. Professional Truck Driver Training School, Inc.*, 328 Ill. App. 3d 472, 476 (2002) (summary judgment for defendant was proper where plaintiff slipped on snow and ice on the step of defendant's truck but no evidence indicated that the accumulation was unnatural). Thus, a plaintiff in a slip-and-fall case involving snow and ice must show that (1) the accumulation of snow or ice was unnatural and (2) the property owner had actual or

---

[1]Allen still had a pending count against ZL for breach of contract, and a pending count against defendant Interforum Holdings, neither of which is at issue in this appeal.

constructive knowledge of the condition. *Hornacek v. 5th Avenue Property Management*, 2011 IL App (1st) 103502, ¶ 29.

¶ 30   But a defendant (whether the property owner or someone else) may voluntarily undertake the removal of natural accumulations of snow and ice. In that case, the defendant has a duty to exercise reasonable care while doing so. *Id.* ¶ 28. The defendant's tort liability to third parties is governed by section 324A of the Restatement (Second) of Torts, which provides:

> "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> > (a) his failure to exercise reasonable care increases the risk of such harm, or
> >
> > (b) he has undertaken to perform a duty owed by the other to the third person, or
> >
> > (c) the harm is suffered because of reliance of the other or the third person upon the undertaking." Restatement (Second) of Torts § 324A (1965).

See *Bell v. Hutsell*, 2011 IL 110724, ¶ 12 (recognizing the adoption of section 324A in Illinois); *Eichler v. Plitt Theatres, Inc.*, 167 Ill. App. 3d 685 (1988) (for purposes of section 324A, snow and ice removal is a service that should be recognized as necessary for the protection of third parties). As noted, Allen argues that she has raised a question of material fact as to whether she can recover under both a voluntary-undertaking theory and an unnatural-accumulation theory.

¶ 31   Initially, the parties disagree as to whether the natural accumulation rule applies to slip-and-fall cases under section 324A. More specifically, Allen argues that when a defendant is contractually obligated to remove naturally fallen snow and ice, a plaintiff who slips and falls on a natural accumulation of snow and ice is entitled to relief in tort. We find that Illinois cases are split on this issue but, as we discuss below, we need not resolve this split because the result in this case is the same regardless of which standard applies.

¶ 32   We begin by considering *Eichler*, the primary case on which Allen relies. While going to a movie theater, Eichler slipped and fell on ice in the parking lot. *Eichler*, 167 Ill. App. 3d at 687. She conceded that the ice was not an unnatural accumulation. *Id.* at 688. Nevertheless, she brought suit against the theater owner and the owner of the land, both of which were contractually obligated to remove snow and ice from the parking lot. *Id.* at 692.

¶ 33   Under these facts, *Eichler* held that summary judgment for those defendants was improper. *Id.* at 692-93. The court articulated a two-part rule: if a defendant is required by contract to remove snow and ice, and the defendant makes *no* attempt to do so, then it may be held liable for injuries resulting from natural accumulations of snow and ice (*id.* at 689-90); but if a defendant takes *some* measures to remove snow and ice, then it may only be held liable if its efforts are "defective," *e.g.*, its snow removal efforts create an accumulation of ice upon which a plaintiff slips. *Id.* at 690 (citing *Burke v. City of Chicago*, 160 Ill. App. 3d 953, 957 (1987)).

¶ 34   In support of its holding, *Eichler* cited two cases in which courts held a landowner had a duty to remove natural accumulations of snow and ice: *Schoondyke v. Heil, Heil, Smart & Golee, Inc.*, 89 Ill. App. 3d 640 (1980), and *Tressler v. Winfield Village Cooperative, Inc.*, 134 Ill. App. 3d 578 (1985). In *Schoondyke*, there was a two-inch snowfall in the morning, but by evening, no shoveling had been performed. *Schoondyke*, 89 Ill. App. 3d at 642. Schoondyke slipped and fell on the sidewalk outside the condominium where she lived. She brought suit

against the condominium association, which assumed in its bylaws a duty to remove snow and ice. Though *Schoondyke* acknowledged the unnatural accumulation rule, it held that, since the association voluntarily assumed a duty of snow removal, "as a matter of law, [the association] owed a duty to plaintiff herein to remove natural accumulations of snow and ice." *Id.* at 645.

¶ 35　　Similarly, Tressler slipped and fell on snow and ice while walking to her mailbox and brought suit against her landlord. *Tressler*, 134 Ill. App. 3d at 579. The tenant handbook stated that the landlord would remove snow. Although Tressler did not allege that the accumulation of snow and ice was unnatural, *Tressler* found that the landlord assumed a duty to remove naturally fallen snow and ice. *Id.* at 580 (citing *Schoondyke*, 89 Ill. App. 3d 640). Because the record did not disclose what efforts, if any, the landlord took to remove the snow and ice, *Tressler* held that summary judgment for the landlord was improper. *Id.* at 581.

¶ 36　　Allen argues that under *Eichler*, *Schoondyke*, and *Tressler*, defendants' contractual obligations subject them to tort liability for injuries to third parties resulting from natural accumulations of snow and ice. But not all Illinois cases have followed *Eichler*. Some cases have held that the duty to "exercise reasonable care" (Restatement (Second) of Torts § 324A (1965)) in snow and ice removal is coextensive with the common-law duty not to create an unnatural accumulation of snow and ice. See, *e.g.*, *McBride v. Taxman Corp.*, 327 Ill. App. 3d 992, 997-98 (2002); *Murphy-Hylton v. Lieberman Management Services, Inc.*, 2015 IL App (1st) 142804, ¶ 26 (under Illinois common law, where a landowner voluntarily undertakes the removal of snow and ice, its duty " 'is to prevent an unnatural accumulation on [its] property, whether that accumulation is the direct result of the owner's clearing of the ice and snow, or is caused by design deficiencies that promote unnatural accumulations of ice and snow' " (quoting *Webb v. Morgan*, 176 Ill. App. 3d 378, 382-83 (1988))); *Tzakis v. Dominick's Finer Foods, Inc.*, 356 Ill. App. 3d 740, 746 (2005) ("While there is generally no duty to remove natural accumulations of ice and snow, a voluntary undertaking may subject defendant to liability if it is performed negligently. *** Liability will be imposed, however, where a plaintiff shows that an injury occurred as the result of snow or ice produced or accumulated by artificial causes or in an unnatural way, or by the defendant's use of the premises." (Internal quotation marks omitted.)). Under these cases, even if defendant had a contractual duty to remove naturally fallen snow and ice, a plaintiff must still show as a prerequisite to recovery that she fell on an unnatural accumulation of snow and ice.

¶ 37　　For instance, in *McBride*, 327 Ill. App. 3d at 993, McBride fell on snow and ice outside a store entrance. She brought suit against various parties, including Arctic, the snow-removal contractor. Arctic's contract with the property manager required that " 'all sidewalk areas shall be completely cleared of ice and snow from end-to-end.' " *Id.* at 994. Despite this contractual obligation, *McBride* held that summary judgment for Arctic was proper because of the natural accumulation rule. The court explained that "[t]here have been cases in which a duty to third parties has been imposed on the snow-removal contractor, but the duty was only not to negligently remove snow by creating or aggravating an unnatural accumulation of snow or ice." *Id.* at 996 (citing *Madeo v. Tri-Land Properties, Inc.*, 239 Ill. App. 3d 288 (1992) (property owner and snowplowing company could not be held liable for customer's slip-and-fall injuries in the absence of evidence that customer slipped on an unnatural accumulation of ice), *Crane v. Triangle Plaza, Inc.*, 228 Ill. App. 3d 325 (1992) (summary judgment was proper for property owner and snow removal contractor since plaintiff presented no factual basis to support her assertion that the ice on which she slipped was caused by an

unnatural accumulation of snow), and *McCarthy v. Hidden Lake Village Condominium Ass'n*, 186 Ill. App. 3d 752 (1989) (summary judgment for snow removal contractor was improper where there was some evidence that snow plowing was done in a defective manner that contributed to plaintiff's fall)). *McBride* found that, because there was no evidence that plaintiff fell on an unnatural accumulation of snow and ice, Arctic could not be held liable in tort, notwithstanding its contractual duty to clear the sidewalks. *Id.* at 998. Although *McBride* involved a snow-removal contractor rather than a landowner, section 324A provides no basis for differentiating between contractors and landowners with regard to liability for negligence in removing snow and ice.

¶ 38 Defendants urge us to follow *McBride*, while Allen urges us to follow *Eichler*. But we need not decide between these standards because the result is the same under both. As noted, *Eichler* only provides an exception to the natural accumulation rule in cases where a party is contractually obligated to remove snow but has performed no snow removal whatsoever. Here, it is undisputed that the parking lot was plowed before Kompera arrived at the Jazzercise studio on the morning of February 9 and again during the afternoon of February 9.

¶ 39 In this regard, the present case is analogous to *Burke*, 160 Ill. App. 3d 953, which was discussed with approval in *Eichler*. Burke, an airline employee, slipped on ice on an airport ramp. He brought suit against the city of Chicago, which owned and maintained the airport, as well as the snow removal contractor hired by the city. The city's lease with Burke's employer required the city to remove snow from ramp areas " 'as reasonably as may be done.' " *Id.* at 955. Citing *Schoondyke* and *Tressler*, Burke argued that based upon the defendants' contractual obligations, they could be held liable for failing to remove natural accumulations of snow and ice from the area where he fell. *Id.* at 956.

¶ 40 The *Burke* court disagreed. It first noted that *Schoondyke* and *Tressler* were of questionable vitality in light of other cases holding that owners and possessors of property cannot be held liable in slip-and-fall cases involving snow and ice in the absence of an unnatural accumulation. *Id.* at 956-57 (citing *McCann v. Bethesda Hospital*, 80 Ill. App. 3d 544 (1980), and *Erasmus v. Chicago Housing Authority*, 86 Ill. App. 3d 142 (1980)). But even if *Schoondyke* and *Tressler* were good law, *Burke* found both cases distinguishable because there was no evidence in either case that defendants engaged in *any* snow removal. *Id.* at 957. By contrast, in *Burke*, the ramp was plowed three hours before Burke fell. *Id.* at 955. Thus, in order to prevail, Burke would have to show that the snow removal operation was "defective" in that it created an unnatural accumulation of ice upon which he slipped. *Id.* at 957. We agree with *Burke*'s reasoning. Therefore, because it is undisputed that the parking lot was plowed before Allen's fall, Allen was required to adduce evidence that the plowing created an unnatural accumulation of ice or snow that caused her fall. We turn now to consider this issue.

¶ 41 Allen argues that the affidavits of her experts created an issue of material fact as to whether there was an unnatural accumulation of ice in the parking lot on the day of her fall. As noted, Lopez testified that when there was heavy snowfall while cars were parked in the lot, it was his practice to plow around the cars. This was corroborated by Kompera, who observed on the morning of February 9 that the snow and ice in the parking lot were "choppy." Both Arlington and Lewis opined that plowing in this manner would create trails of snow and ice that would thaw and refreeze in depressions in the lot, such as the area where Allen fell. Lewis also opined, based upon a drainage flow diagram of the parking lot, that Lopez's practice of

depositing snow mounds at the southeast end of the lot would cause runoff to refreeze in depressions in the lot.

¶ 42   But even though Allen presented some evidence of an unnatural accumulation of ice in the parking lot, she cannot establish a causal nexus between that ice and her fall since she stated in her deposition she did not know whether she fell on ice. Allen's experts testified to an unnatural accumulation of ice caused by thawing and refreezing, but there was no evidence of an unnatural accumulation of snow. Thus, it is vital to Allen's case that her fall was caused by ice rather than snow. But Allen stated unequivocally on multiple occasions that she did not see ice in the location of her fall:

> "Q. But you can't say with any degree of certainty if it was a patch of ice that you slipped on, correct?
>
> A. I did not see any ice, but I did see snow.
>
> Q. Since you didn't see any ice, would you agree that any statement that you would have tripped on ice would be a guess on your part?
>
> A. It would be a guess on my part."

And Allen disavowed seeing any runoff from the mounds of snow at the edge of the parking lot at all, much less in the area of her fall.

¶ 43   It is axiomatic that mere guesswork or speculation is insufficient to create a genuine issue of material fact to survive a motion for summary judgment. *Judge-Zeit v. General Parking Corp.*, 376 Ill. App. 3d 573, 584 (2007) (citing *Tzakis*, 356 Ill. App. 3d at 747). Thus, in a slip-and-fall case, summary judgment for defendants is proper when plaintiff has no evidence regarding the cause of her fall. *Strutz v. Vicere*, 389 Ill. App. 3d 676, 679 (2009). " '[A]bsent positive and affirmative proof of causation, plaintiff cannot sustain the burden of establishing the existence of a genuine issue of material fact.' " *Id.* (quoting *Kellman v. Twin Orchard Country Club*, 202 Ill. App. 3d 968, 974 (1990)).

¶ 44   For instance, in *Strutz*, the plaintiff's husband fell down a stairway and died from his injuries. Plaintiff brought suit against the building owners, alleging that the condition of the staircase was unreasonably dangerous—an assertion supported by expert testimony that the staircase's condition violated the city's building code. *Id.* at 678. But plaintiff lacked any evidence as to the cause of her husband's fall. *Id.* at 681. Accordingly, *Strutz* affirmed summary judgment for defendants, finding that plaintiff could not establish the necessary causal relationship between defendants' alleged negligence and her husband's injuries. *Id.* Similarly, Allen cannot establish a causal link between the ice allegedly created by defendants' plowing and her fall.

¶ 45   Allen cites various slip-and-fall cases where judgment for plaintiff was affirmed because of circumstantial evidence of an unnatural accumulation of snow and/or ice. These cases are distinguishable because the plaintiffs were able to identify the cause of their fall and produce evidence linking it to defendants' snow removal procedures. For example, in *Webb*, 176 Ill. App. 3d at 383-84, Webb testified that she slipped and fell on ice, and there was evidence that the ice was "the product of an unnatural accumulation caused by water running off snow from the banks onto the common parking area and refreezing."

¶ 46   Similarly, in *Sims v. Block*, 94 Ill. App. 2d 215, 217 (1968), Sims testified that he slipped off a ridge of snow covered with ice. The ridge was along the side of his car, which he had parked there the previous evening. Testimony from the snow removal contractor indicated that

it was its practice to plow around parked cars, and "it is a fair inference from the record that the spillover of the snow as the plow skirted the parked car would have increased the depth of the snow at that location." *Id.* at 219.

¶ 47 Unlike Webb, who testified that she fell on ice, or Sims, who testified that he fell on a ridge of snow covered with ice, Allen only "assum[ed]" and "guess[ed]" that she fell on ice, which she argues was caused by defendants' defective plowing. Since liability cannot be based on mere speculation (*Judge-Zeit*, 376 Ill. App. 3d at 584; *Strutz*, 389 Ill. App. 3d at 679), summary judgment for defendants was appropriate.

¶ 48 Finally, Allen argues that the trial court abused its discretion in denying her leave to file a third amended complaint. In deciding whether a party should be permitted to amend her complaint, courts consider "(1) whether the proposed amendment would cure the defective pleading; (2) whether other parties would sustain prejudice or surprise by virtue of the proposed amendment; (3) whether the proposed amendment is timely; and (4) whether previous opportunities to amend the pleading could be identified." (Internal quotation marks omitted.) *Sheffler v. Commonwealth Edison Co.*, 399 Ill. App. 3d 51, 74 (2010). But if the proposed amendment fails to satisfy the first factor, no further analysis is necessary. *Id.*

¶ 49 In Allen's proposed third amended complaint, she added allegations against both Alliance and ZL. Specifically, she alleged that Alliance (i) had a lease with Jazzercise that required it to remove snow and ice on a timely basis, (ii) failed to do so in violation of the lease, (iii) knew of depressions in the parking lot that would "capture" melted snow, which would then refreeze, and (iv) failed to regularly inspect the premises or have a reasonable snow management plan. With regard to ZL, she attached a copy of ZL's contract with Alliance, which stated that ZL would plow after two inches of snowfall and that plowing would be done at night "if possible" so that the parking lot would be clear by morning. Allen alleged that ZL (i) did not plow after two inches of snowfall, (ii) did not plow at night, and (iii) created unnatural accumulations of ice and snow in areas in the parking lot that it knew or should have known would capture water and refreeze.

¶ 50 None of these additional allegations would cure the fatal defect in Allen's case—namely, that she cannot establish a causal nexus between the alleged unnatural accumulation of ice in the parking lot and her fall. Accordingly, the trial court did not abuse its discretion in denying her leave to file her third amended complaint.

¶ 51 CONCLUSION

¶ 52 Illinois law is split as to whether a defendant who is contractually obligated to remove natural accumulations of snow and ice, and fails to take *any* action, can be liable in tort to a third party who slips and falls on the naturally fallen snow and ice. But the law is clear that if defendant does engage in snow removal efforts, a slip-and-fall plaintiff is required to show those efforts were defective, *i.e.*, defendant caused an unnatural accumulation of snow and ice that caused her fall. Allen cannot do so. Although her experts opined that ZL's snow clearing procedures would have created an unnatural accumulation of ice in the Jazzercise parking lot, Allen did not see whether she fell on ice, so she cannot establish a causal link between the alleged unnatural ice and her fall beyond mere speculation. Finally, the trial court did not err in denying Allen leave to file a third amended complaint when none of her added allegations would have enabled her to defeat summary judgment.

¶ 53    Affirmed.